**CVI/BETA VENTURES, INC., et al., Plaintiffs,**

v.

**CUSTOM OPTICAL FRAMES, INC., et al., Defendants.**

**Civ. No. PJM 94–760.**

United States District Court, D. Maryland, Southern Division.

July 14, 1995.

512

Robert J. Mathias, Piper & Marbury, Baltimore, MD, Edgar H. Haug and John R. Lane of Curtis, Morris and Safford, P.C., New York City, for plaintiffs.

Arthur F. Fergenson, Weinberg & Green, Baltimore, MD, for defendants.

*OPINION*

MESSITTE, District Judge.

In this patent infringement case the Court, on August 4, 1994, issued a preliminary injunction in favor of Plaintiffs CVI/BETA Ventures, Inc., et al. against Defendants Custom Optical Frames, Inc. and Charles Dahan, prohibiting them from shipping or distributing nickel-titanium based shape-memory alloy eyeglass frames to certain named retailers or from filling orders of more than one hundred such frames to any one person, company or entity. *See CVI/Beta Ventures, Inc., et al. v. Custom Optical Frames, Inc.*, 859 F.Supp. 945 (D.Md.1994). Subsequently and by agreement of the parties, the preliminary injunction was converted *nunc pro nunc* to a temporary restraining order. From September 19 to 22, 1994, the Court held a further evidentiary hearing on Plaintiffs' Motion for Preliminary Injunction. Having read and considered the detailed post-hearing submissions of the parties, the Court concludes that a preliminary injunction should issue.

## I. *INTRODUCTION*

The patents in question relate to eyeglass frames fabricated from nickel-titanium based (NiTi) shape-memory alloy (SMA) components. Such eyeglass frame components, when work-hardened,[1] exhibit elasticity and are resistant to permanent deformation. Plaintiff CVI/Beta Ventures, Inc. (Beta) holds United States Letter Patent No. 4,772,-112 entitled "Eyeglass Frame Including Shape Memory Elements" (the "112 patent"), as well as Patent No. 4,896,955 entitled "Eyeglass Frame Including Shape Memory Elements" (the "955 patent"). Plaintiff Marchon Eyewear, Inc. (Marchon) is the exclusive licensee of Plaintiff Beta for importing, marketing and selling in the United States eyeglass frames falling within the scope of the '112 and '955 patents. Plaintiffs Marcolin U.S.A. Inc. (Marcolin) and Rothandberg, Inc. (Rothandberg) import and distribute the licensed products under the supervision, management and control of Marchon. Under the trademark "Flexon," "Autoflex," and "Accuflex," Marchon and its affiliates have been selling, advertising and promoting the patented frames in the United States since 1989.

Defendant Custom Optical Frames, Inc. (Custom Optical) is a Maryland corporation of which Defendant Charles Dahan (Dahan) is the President. Defendant/Intervenors Kanto Special Steel Works, Ltd. (Kanto) and Nissey Co., Ltd. (Nissey) manufacture the accused frames, which Defendants Custom Optical and Dahan sell in the United States.

Plaintiffs allege that, in or about the Spring of 1994, Custom Optical and Dahan commenced to import, use, offer for sale and sell, under the name "Technoflex," eyeglass frames that incorporate nickel-titanium based shape-memory alloy. These frames,

---

**1.** "Work-hardening" is a process of deforming a material, such as by swaging, pressing, or drawing.

according to Plaintiffs, infringe one or more claims of Beta's patents.

They seek preliminary injunctive relief, however, only with respect to Claim 1 of the '955 patent, which covers:

An eyeglass frame having at least a portion thereof fabricated from nickel-titanium based shape-memory alloy, said portion being in the work-hardened pseudoelastic metallurgical state, said portion having been subjected to work-hardening and having a low effective elastic modulus giving a soft, spring feel, said portion having greater than 3% elasticity over a temperature range from −20°C. to +40°C.

Further relevant facts will be recited in the course of this Opinion.

## II. *PRELIMINARY INJUNCTION STANDARDS*

### A) *In General*

District courts are authorized by statute to issue preliminary injunctions in patent cases. 35 U.S.C. § 283. The law of the Federal Circuit controls with regard to their issuance. *Hybritech, Inc. v. Abbott Labs.*, 849 F.2d 1446, 1451 n. 12 (Fed.Cir. 1988). Whether to issue a preliminary injunction is discretionary with the trial court. *Reebok Int'l, Ltd. v. J. Baker, Inc.*, 32 F.3d 1552, 1555 (Fed.Cir.1994).

As recently reiterated in *Reebok*, "Whether a preliminary injunction should issue turns upon four factors: (1) the movant's reasonable likelihood of success on the merits; (2) the irreparable harm the movant will suffer if preliminary relief is not granted; (3) the balance of hardships tipping in its favor; and (4) the adverse impact on the public interest." 32 F.3d at 1555; *see also Hybritech*, 849 F.2d at 1451. While not absolutely required, it is preferable that the district court make findings as to each of the four factors that weigh in the balance when deciding to grant or deny a preliminary injunction. *Reebok*, 32 F.3d at 1555.

The patentee bears the burden of proof with regard to each of these elements. *Id.* That burden, however, is no more stringent in patent cases than it is in preliminary

injunction suits in general. *H.H. Robertson Co. v. United Steel Deck, Inc.*, 820 F.2d 384, 388 (Fed.Cir.1987). This means that the party seeking the preliminary injunction may rely upon statutory or such other presumptions as may be inherent in the nature of the case. *Id.*

### B) *Likelihood of Success on the Merits*

1) With regard to the issue of likelihood of success on the merits, the burden is upon the patentee to demonstrate the validity, enforceability, and infringement of the patent. *Nutrition 21 v. United States*, 930 F.2d 867, 869–70 (Fed.Cir.1991); *Reebok*, 32 F.3d at 1555; *Hybritech*, 849 F.2d at 1451. Its burden in this regard, however, necessarily refers to what its burden would be at trial, *H.H. Robertson*, 820 F.2d at 388, where, with regard to the issue of validity, the patentee would enjoy a statutory presumption of validity. *Lannom Mfg. Co. v. United States Int'l Trade Comm'n*, 799 F.2d 1572, 1575 (Fed.Cir.1986). Such a presumption is fortified to the extent that there has been a reexamination of the patent by the Patent and Trademark Office (PTO). *E.I. du Pont de Nemours & Co. v. Polaroid Graphics Imaging, Inc.*, 706 F.Supp. 1135, 1141 (D.Del.), *aff'd without op.*, 887 F.2d 1095 (Fed.Cir.1989). Moreover, at trial the burden of proof with regard to the patent's invalidity would be upon the alleged infringer and would consist of proof not merely by a preponderance of the evidence, but proof that is clear and convincing. *H.H. Robertson*, 820 F.2d at 388; *Greenwood v. Hattori Seiko Co., Ltd.*, 900 F.2d 238, 241 (Fed.Cir. 1990). Restated, a patentee's burden with respect to the element of validity at the preliminary injunction stage is to demonstrate that no clear and convincing evidence of invalidity has been adduced.

2) The same standard applies with regard to alleged inequitable conduct on the part of the patentee that might affect the enforceability of the patent. The patentee bears the burden at the preliminary injunction stage of proving the likelihood of succeeding at trial with regard to the issue of enforceability. *Nutrition 21*, 930 F.2d at 869. But, again, at trial the patentee would

begin with the benefit of a presumption of validity while the burden of proving inequitable conduct such as to preclude enforceability would be upon the accused infringer. *FMC Corp. v. Manitowoc Co.*, 835 F.2d 1411, 1415 (Fed.Cir.1987). That burden, moreover, would be one of clear and convincing evidence. *Kingsdown Medical Consultants, Ltd. v. Hollister, Inc.*, 863 F.2d 867, 877 (Fed.Cir.1988) (in part *en banc* ), *cert. denied*, 490 U.S. 1067, 109 S.Ct. 2068, 104 L.Ed.2d 633 (1989). The patentee may thus prevail on the issue of validity at the preliminary injunction stage either by reason of the presumption of validity (assuming there is no evidence contra and no accusation of inequitable conduct), or if there is a charge of inequitable conduct, by showing that a defendant's evidence of inequitable conduct would not likely carry the day clearly and convincingly at trial.

 3) Preliminarily, the patentee must also show a reasonable likelihood of success with regard to the issue of infringement. *Reebok*, 32 F.3d at 1555; *Hybritech*, 849 F.2d at 1451. As to this element, however, no presumption is available to assist the patentee either at the preliminary injunction phase or at trial. At trial the burden will be upon the patentee to demonstrate, by a preponderance of the evidence, that defendant has infringed. Thus the patentee is required to present evidence at the preliminary stage that would persuade the court that it is likely to establish at trial, by a preponderance of the evidence, that there has been infringement. *H.H. Robertson*, 820 F.2d at 390.

 4) Proof of infringement, whether at the preliminary or merits stage, involves two steps. First, the meaning of the patent must be determined, a step commonly referred to as claim interpretation. *Minnesota Mining & Mfg. Co. v. Johnson & Johnson Orthopaedics, Inc.*, 976 F.2d 1559, 1570 (Fed.Cir.1992). Second, the patent so construed must be applied to the accused product. *Id.* Claim interpretation is a question of law to be decided by the court at both the preliminary and merits stages. *Id.* Application poses a question of fact for the court to decide at the preliminary stage, for the jury at the trial stage. *Id.* Again, the burden

upon the patentee at the preliminary stage is to demonstrate that it is reasonably likely to succeed in proving these points by a preponderance of the evidence at trial. *H.H. Robertson*, 820 F.2d at 390.

## C) *Irreparable Harm*

 In addition to proving reasonable likelihood of success on the merits, the patentee is required to establish that it will suffer irreparable harm if a preliminary injunction is not granted. *Reebok*, 32 F.3d at 1556. To the extent that the requirements for preliminary injunctive relief in patent cases approximate those of cases in general, the patentee's burden is only to show that it is more likely than not that it will be irreparably harmed if the injunction is not granted. This it may do by presenting appropriate evidence of harm, examples of which will be discussed presently. However, in the context of patent law, to the extent that the patentee "clearly establishes" or makes a "strong showing" of likelihood of success on the merits (including continuing infringement), it is entitled to a presumption of irreparable harm. *Id.* While this presumption is rebuttable, it alone will suffice, unless the record evidence outweighs it, to permit the court, in its discretion, to find irreparable harm. *See* Fed.R.Evid. 301. In other words, "a strong showing" of irreparable harm is not required before a preliminary injunction is issued, only a preponderance of evidence need be adduced. But if there is in fact "a strong showing" of likelihood of success on the merits, the patentee will be entitled to a presumption of irreparable harm.

## D) *Balance of Hardships*

 By whatever route the court might reach its conclusion of irreparable harm, it must still consider whether the balance of hardships favors or disfavors issuance of the preliminary injunction. "The district court must balance the harm that will occur to the moving party from the denial of the preliminary injunction with the harm that the nonmoving party will incur if the injunction is granted." *H.H. Robertson*, 820 F.2d at 390. The court, however, is not required to make an explicit finding as to this factor, nor is a

movant necessarily to be denied a preliminary injunction if the evidence is in equipoise. *Hybritech,* 849 F.2d at 1451.

### E) *The Public Interest*

■ The final factor in the preliminary injunction calculus, the public interest, is typically relevant only if the public interest will be critically affected by the issuance of the injunction. *Hybritech,* 849 F.2d at 1458. Absent such proof, it may be assumed that the public interest will not be so affected.

### III. *PRELIMINARY INJUNCTION FACTORS CONSIDERED*

#### A) *Likelihood of Success on the Merits*
##### 1) *Validity*

■ a) Plaintiffs begin this case with the benefit of a presumption that the '955 patent is valid, *Lannom Mfg.,* 799 F.2d at 1575, a presumption enhanced by the fact that the patent has been reexamined by the PTO. *E.I. du Pont v. Polaroid,* 706 F.Supp. at 1141. Only if the Court finds that Defendants have raised a substantial question in support of invalidity do Plaintiffs need to consider the presentation of further evidence. *New England Braiding Co. v. A.W. Chesterton Co.,* 970 F.2d 878, 882 (Fed.Cir.1992). Assuming a substantial question has been raised, Plaintiffs run the risk of losing their suit for preliminary relief if they fail to come forward with countervailing proof tending to establish validity. *Power Controls Corp. v. Hybrinetics, Inc.,* 806 F.2d 234, 240 (Fed.Cir. 1986). Although Defendants allege that the '955 patent is invalid due to anticipation and obviousness and unenforceable due to inequitable conduct, the Court is not persuaded that they have raised a substantial question in any of these respects. Assuming *arguendo* that they have, the Court concludes that Plaintiffs have demonstrated that the defenses lack substantial merit.

■ b) Beyond the presumptive validity of a patent, a patentee may urge a patent's validity by showing that the patent has previously been adjudicated valid, that there has been public acquiescence in its validity, or that direct technical evidence proves its validity. *Smith Int'l, Inc. v. Hughes Tool Co.,* 718 F.2d 1573, 1578 (Fed.Cir.), *cert. denied,* 464 U.S. 996, 104 S.Ct. 493, 78 L.Ed.2d 687 (1983). Defendants argue that there has never been an adjudication of the validity of the '955 patent and that there is no evidence that the industry has accepted or acquiesced in its validity, inviting in their post-trial submissions the Court's attention to the fact that the validity of the '955 patent was under challenge by an entity known as Tura, L.P. in a proceeding before the United States District Court for the Eastern District of New York. Since the hearing in the present matter, however, the jury in the Tura litigation returned a special verdict upholding the validity of Plaintiffs' '955 patent. *See CVI/Beta and Marchon Eyewear, Inc., et al., Plaintiffs v. Tura, L.P., et al., Defendants* (E.D.N.Y., CV 91–1710, 12/22/95). In short, there has now been an adjudication of validity, although the Court at this writing is advised that post-trial motions in the case are still pending. Apart from that and contrary to what Defendants contend, Plaintiffs did in fact present evidence in this proceeding of industry acceptance and acquiescence in the patent's validity. Of more than 250 eyeglass frames companies selling in the United States, according to Plaintiffs' proof, only Tura (unsuccessfully, it now appears) and Defendants have challenged the patent. This is so, despite the fact that sales of the Flexon frames represent an unquestionably attractive market, estimated to bring Plaintiffs $45 to $50 million in sales during 1995.

c) The Court further concludes that it is not reasonably likely that Defendants will be able to show at trial, clearly and convincingly, that Claim 1 of Patent '955 was either anticipated or obvious or that it should not be enforced because of inequitable conduct on the part of Plaintiffs.

■ i) Under 35 U.S.C. § 102(a), a patent is obtainable if it was never "known or used by others in this country, or patented or described in a printed publication in this or a foreign country, before the invention thereof by the applicant for patent...." If the device or process was used or described previously, it is said to have been "anticipated," hence unpatentable. Anticipation requires that the identical invention claimed was pre-

viously known to others and thus is not new. *Continental Can Co. USA v. Monsanto Co.,* 948 F.2d 1264, 1267 (Fed.Cir.1991). Defendants assert that Claim 1 of the '955 patent was anticipated by Japanese patent 58–186719 ("the '719 reference") and is thereby rendered invalid.

■ Although Defendants' expert on nickel-titanium shape-memory alloy, Dr. Schetky, testified to identical descriptions of some elements in the '719 reference and Claim 1 of the '955 patent, he did not testify convincingly that the '719 reference discloses the features of either the work-hardened pseudoelastic metallurgical state or 3% elasticity over the claimed temperature range. As to these limitations, his testimony was at best vague, leaving Defendants to argue, for example, that the frame disclosed in '719 would "inherently satisfy" the 3% elasticity property across the temperature range. "Inherency, however, may not be established by probabilities or possibilities. The mere fact that a thing may result from a given set of circumstances is not sufficient." *Continental Can,* 948 F.2d at 1269. The Court finds unpersuasive Defendants' argument that the '719 reference anticipates the '955 patent under 35 U.S.C. § 102(a).

e) Even if a reference does not "anticipate" each element of a patent claim, the reference may still invalidate the patent claim "if the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains." 35 U.S.C. § 103. The Supreme Court and the Federal Circuit have held that "obviousness" is determined on the basis of four factors:

i) The scope and content of the prior art;

ii) The differences between the prior art and the claims at issue;

iii) The level of ordinary skill in the art; and

iv) Objective evidence of secondary conditions.

■ *Graham v. John Deere Co.,* 383 U.S. 1, 17–18, 86 S.Ct. 684, 693–94, 15 L.Ed.2d 545 (1966); *Specialty Composites v. Cabot Corp.,* 845 F.2d 981, 989 (Fed.Cir.1988). The Court finds Plaintiffs are likely to succeed at trial as to this issue since nothing in the record suggests that Defendants will be able to show the requisite elements of obviousness clearly and convincingly.

Again Defendants rely on the '719 reference as the scope and content of the prior art for purposes of arguing obviousness. Again, however, there are significant differences between the prior art and the claim at issue. The '719 reference fails to teach at least two essential characteristics of Claim 1 of the '955 patent: First, that the frame component is in the work-hardened pseudoelastic metallurgical state and, second, that its frame component exhibits 3% elasticity over the required temperature range. The most forceful declaration Defendants' expert could muster in this regard was that the '719 reference "would anticipate that with perhaps further development would be … could be considered as the grandfather of '955." This tentative, halting statement hardly comports with clear and convincing evidence of obviousness.

Furthermore, on the matter of the level of ordinary skill in the art, the third factual inquiry on the issue of obviousness, there appears to be no record evidence at all. In default of such evidence, the Court concludes that Plaintiffs have borne their burden of likely success on the point of trial, *i.e.* that Defendants will not be able to show clearly and convincingly, to someone ordinarily skilled in the art, that the '719 reference made the '955 patent obvious.

■ In any case, the Court finds persuasive Plaintiffs' objective evidence of non-obviousness, the fourth factor under *Graham.* See *Gillette Co. v. S.C. Johnson & Son, Inc.,* 919 F.2d 720, 725 (Fed.Cir.1990).[2] According

---

**2.** A patentee may rely upon secondary considerations, only if it presents a prima facie case that its product was made according to its claimed invention. *See Demaco Corp. v. F. Von Langs-* *dorff Licensing Ltd.,* 851 F.2d 1387, 1392 (Fed. Cir.), *cert. denied,* 488 U.S. 956, 109 S.Ct. 395, 102 L.Ed.2d 383 (1988). As discussed *infra,* the

to Plaintiffs' proof, several frame suppliers over the years attempted to develop flexible frame components, yet none was able to develop a commercially acceptable product prior to the teaching of the Beta patents. Further, according to Robert Zider, one of the named inventors of the '955 patent, persons skilled in the field expressed skepticism over his experiments with nickel-titanium shape-memory alloys when he initially proposed the idea. In the face of Plaintiffs' clear commercial success with their product, all but two of the more than 250 companies in the frame business have respected the Beta patents. Further, as Defendant Dahan concedes, some of Defendants' customers have expressed concern over the legitimacy of Defendants' product and a few have even asked Defendants to post an infringement bond. Custom Optical and Dahan themselves declined to undertake their operations until fully indemnified by the Japanese manufacturer-intervenors. With projected sales of $50 million in this year alone, one would expect that a patent that was truly obvious, *i.e.* of questionable validity, might have been more actively challenged. That it has not been strongly suggests the market's doubts as to the obviousness of the patent.

f) An applicant's intentional failure to disclose a material prior art reference, when seeking approval of a patent, constitutes inequitable conduct and the patent will not be enforced if it is shown that:

i) the omitted reference would have been material to the PTO's examination of the application;

ii) the applicant knew of the reference and of its materiality; and

iii) the failure of the applicant to disclose the reference was the result of an attempt to mislead the PTO. *FMC Corp.*, 835 F.2d at 1415.

A reference is deemed "material," according to PTO rules, if there is a substantial likelihood that a reasonable examiner would have considered it important in deciding whether to allow the application to issue as a patent. 37 C.F.R. § 1.56. In the

absence of direct evidence, an attempt to mislead may be inferred if the applicant should have known or appreciated the materiality of a reference. *Burlington Indus. v. Dayco Corp.*, 849 F.2d 1418, 1421 (Fed.Cir. 1988). On the other hand, proof of "inequitable conduct" may be rebutted by a showing that a) the prior art or information was not material; or b) if the prior art was material, that the applicant did not know of that art; or c) if the applicant did know of the art, that the applicant did not know its materiality; or d) that any failure of the applicant to disclose the art did not result from an attempt to mislead the PTO. *FMC Corp.*, 835 F.2d at 1415.

Plaintiffs' burden of proof at the preliminary stage is only to show that clear and convincing evidence of inequitable conduct on its part is not likely forthcoming.

The sole fact that appears to be clearly established at this point is that Plaintiffs knew of the '719 reference during the application process. What is far more debatable is the extent of the materiality of that reference or whether it resulted from an attempt on the part of Plaintiff to mislead the PTO. In fact, Robert Zider, one of the co-inventors of the '955 patent, testified that he did not believe the reference to be material when compared to more than 20 prior art references already submitted, primarily because it appeared to be cumulative with prior art cited to the PTO. In light of the lack of identity between the '719 reference and the '955 patent, as discussed above, Zider's belief appears to have been reasonable. Moreover, Plaintiffs placed in evidence an Office Action Memorandum of the PTO dated July 21, 1989, which requested them to stop submitting prior art if it was redundant of references already submitted. Given the apparently reasonable belief that the '719 reference was a redundant reference, it seems unlikely that Defendants will be able to prove clearly and convincingly at trial that Plaintiffs possessed the requisite intent to mislead the PTO. Accordingly, Plaintiffs have demonstrated their likelihood of success with regard to the issue of any possibly inequitable conduct on their part.

Court holds that Plaintiffs have made a prima facie case in this regard.

### 2) *Infringement*

The Court concludes that Plaintiffs have also proven likelihood of success on the merits with regard to infringement of Claim 1 of the '955 patent. The Court considers first the proper meaning and scope of the patent without reference to the alleged infringing product, *SRI Int'l v. Matsushita Elec. Corp.*, 775 F.2d 1107, 1118–20 (Fed.Cir. 1985) (en banc) (Markey, C.J., plurality opinion), then compares the construed claim with the accused device. *Vaupel Textilmaschinen KG v. Meccanica Euro Italia S.P.A.*, 944 F.2d 870, 879 (Fed.Cir.1991). The Court bears in mind that, to prove infringement, a patentee must show that the accused device includes every limitation of the claim. *Carroll Touch, Inc. v. Electro Mechanical Sys., Inc.*, 15 F.3d 1573, 1576 (Fed.Cir.1993).[3]

a) Claims are to be construed in light of the claim language, the specification, other claims, the prosecution history, and where appropriate, extrinsic evidence such as expert testimony. *Hormone Research Foundation, Inc. v. Genentech, Inc.*, 904 F.2d 1558, 1562 (Fed.Cir.1990), *cert. dismissed*, 499 U.S. 955, 111 S.Ct. 1434, 113 L.Ed.2d 485 (1991). The construction of claims is to be made from the perspective of a hypothetical person skilled in the art at the time the application was filed, although testimony of experts may be relied upon in that regard. *Moeller v. Ionetics, Inc.*, 794 F.2d 653, 656, 657 (Fed.Cir.1986). In construing a claim, the court generally begins with the language of the claim itself. *North American Vaccine, Inc. v. American Cyanamid Co.*, 7 F.3d 1571, 1575 (Fed.Cir.1993), *cert. denied*, —— U.S. ——, 114 S.Ct. 1645, 128 L.Ed.2d 365 (1994). While the words of the claim are given their ordinary meaning, a patent applicant may be his own lexicographer, in which case "he must set out his uncommon definition in some manner within the patent disclosure." *Hoganas AB v. Dresser Indus.*, 9 F.3d 948,

951 (Fed.Cir.1993); *Intellicall, Inc. v. Phonometrics, Inc.*, 952 F.2d 1384, 1385 (Fed.Cir. 1992). When the meaning of a claimed term is doubtful, the court looks to the specification, including the figures, for guidance. *North American Vaccine*, 7 F.3d at 1576.[4]

b) The Court considers the five "elements" or limitations in Claim 1 of the '955 patent:

1) *An eyeglass frame having at least a portion fabricated from NiTi.*

The parties agree that the meaning of this limitation is plain and stipulate that Defendants' product embodies it.

2) *Said portion being in the work-hardened pseudoelastic metallurgical state.*

The second limitation of Claim 1 provides that the frame portion must be in the work-hardened pseudoelastic metallurgical state. Defendants contend that the phrase "in the work-hardened pseudoelastic state" has narrow meaning, covering only frames that are work-hardened *while* in the pseudoelastic state. Relying upon this definition, Defendants argue that Plaintiffs have failed to show that Defendants' frames were work-hardened while in the pseudoelastic state, hence they have failed to prove that those frames "read on" this limitation of the claim. For their own part, Defendants offer no evidence whether their frames were work-hardened while within or without the pseudoelastic state.

Plaintiffs concede that work-hardening material while in the pseudoelastic state is an acceptable, perhaps even the preferred, means for reaching the work-hardened pseudoelastic state, but insist that there is no indication in the patent for limiting the claim to this particular process. *See Specialty Composites*, 845 F.2d at 987 ("Nowhere does the specification in the '487 patent teach that external plasticizers *must* be used." (emphasis in original)). The Court agrees.

---

**3.** If an accused process or device does not contain a specific element of the claim, there may still be infringement under the "doctrine of equivalents" if the process or device performs substantially the same function in substantially the same way to achieve the same result. *Tandon Corp. v. United States Int'l Trade Comm'n*, 831 F.2d 1017, 1026 (Fed.Cir.1987). However, to rely upon the doctrine of equivalents, the

patentee must clearly indicate its intent to do so, which Plaintiffs have chosen not to do in the present case.

**4.** In this context, the "specification" of a patent refers to everything which precedes the claims, including the figures. *See* 35 U.S.C. § 112.

■ The words of Claim 1, in the Court's view, in no way specify or limit the method or process by which such a state is reached. Claim 1 does not appear to be a process claim, neither is it a "product by process limitation" as suggested by Defendants' expert Mr. Bjorge. Under 35 U.S.C. § 112 a patentee is only required to provide one process that would enable one skilled in the art to make the invention and to disclose the best mode known for making or using the patented product. *See SRI,* 775 F.2d at 1121 (Markey, C.J., plurality opinion). "A product patent gives the patentee the right to restrict the use and sale of the product regardless of how and by whom it was manufactured." *United States v. Studiengesellschaft Kohle, m.b.H.,* 670 F.2d 1122, 1127 (D.C.Cir.1981).

■ While Defendants cite various remarks made by Plaintiffs during the prosecution of the patent to read this process limitation into the claim, the Court finds that, at most, those remarks may be understood as illustrating structural differences between prior art and the claimed invention, not as establishing process limitations on the claim. *See SRI,* 775 F.2d at 1119–20 (Markey, C.J., plurality opinion); *Intervet America v. Kee-Vet Labs., Inc.,* 887 F.2d 1050, 1054 (Fed.Cir. 1989).

Defendants admit that their frames are work-hardened and pseudoelastic. The Court therefore finds Plaintiffs are likely to establish at trial that Defendants' frames meet the second limitation of Claim 1.

3) *Said portion having been subject to work-hardening.*

The third element of Claim 1 is that "said portion (has) been subjected to work-hardening." Defendants contend that the teaching of the specification is that work-hardening of at least about 30% must be applied to material in the pseudoelastic state to attain the claimed work-hardened pseudoelastic state and the claimed elasticity, whereas the only evidence presented at the hearing established that the degree of work-hardening in Defendants' process was no more than 10%.

■ The language of the claim, however, clearly contains no reference to work-hardening of at least 30% to attain the claimed work-hardened pseudoelastic state or claimed elasticity. Literally, even minimal work-hardening is covered. Claim 1 of the '112 patent, in marked contrast, which is *not* in issue at this stage of the proceedings, does contain a 30% work-hardening limitation and certain examples within the '955 specification do refer to 30% work-hardening. In no respect, however, does the evidence suggest that the patentees ever argued that 30% work-hardening was necessary to avoid prior art or that any prior art disclosed material in a work-hardened pseudoelastic metallurgical state in which work-hardening was less than 30%. Indeed, Plaintiffs have shown that, in a Second Preliminary Amendment in the '955 file history, they deleted all reference in Claim 1 to 30% work-hardening, stating that the claim as amended claimed a portion "subjected generally to work-hardening." Plaintiffs further declared in the amendment that their "examples of work-hardening, including preferred percentages whenever added, are illustrative only and should not be a limitation of the claim." It is an accepted rule of claim construction that the presence of a limitation in some claims, which is absent from other claims, will support the interpretation that the latter claims did not have a limitation. *Specialty Composites,* 845 F.2d at 987. The Court interprets this limitation to require only that frames have been subjected to minimal work-hardening. Accordingly, the Court finds that Plaintiffs are likely to succeed at trial in showing Defendants' frames contravene the third element of Claim 1.

4) *Having a low effective elastic modulus giving a soft springy feel.*

■ The fourth element of Claim 1 of the '955 patent requires that the frame have a "low effective elastic modulus giving a soft springy feel." Defendants argue that this expression is "non-quantifiable and highly subjective," not otherwise defined in the specification or prosecution history. They contend that since there is no legally acceptable method for interpreting this element, Plaintiffs have failed to show that Defendants' frames satisfy the element. Plaintiffs' expert Professor Beshers testified, however, that effective modulus of elasticity can be

determined from stress-strain curves of material determined through tensile tests of the sort he in fact conducted upon Defendants' frames. From those tests, he concluded that "the effective elastic modulus [of Defendants' frames] are an order of magnitude that is roughly 10 times smaller than the ordinary elastic modula for metals." He also testified that the low effective elastic modulus is consistent with the "soft, springy feel" of Defendants' frame components. Contrary to Defendants' claim, therefore, the claimed limitation is objective insofar as the low effective elastic modulus is quantifiable.

While it may well be subjective to say that the frame components must feel soft and springy, contrary to Defendants' assertion, courts have in fact interpreted and upheld comparably subjective terms in light of the purpose of the claimed invention. In *Bausch & Lomb, Inc. v. Barnes–Hind/Hydrocurve, Inc.*, for example, the Federal Circuit rejected the district court's holding that defendant's contact lenses were not "smooth." 796 F.2d 443, 450 (Fed.Cir.1986), *cert. denied,* 484 U.S. 823, 108 S.Ct. 85, 98 L.Ed.2d 47 (1987). The district court had relied on electron microscope photographs showing roughness on the lens surface in reaching its conclusion. The Circuit Court reversed, stating "we hold that 'smooth' means smooth enough to serve the inventor's purposes, *i.e.* not to inflame or irritate the eyelid of the wearer or be perceived by him at all when in place." 796 F.2d at 450; *see also Laitram Corp. v. Cambridge Wire Cloth Co.,* 863 F.2d 855, 858 (Fed.Cir.1988), *cert. denied,* 490 U.S. 1068, 109 S.Ct. 2069, 104 L.Ed.2d 634 (1989) ("[T]he district court properly interpreted the claim in light of the prosecution history in the first trial, defining 'slightly greater' spacing in terms of its purpose...."). "Soft and springy" is no more elusive a term than those interpreted in *Bausch & Lomb* and *Laitram.*

Defendants also argue that "soft springy feel," as understood from Plaintiffs' advertisements and demonstrations, implies that the frame is easily wrapped around one's index finger. Since, according to Defendants, their expert testified it was impossible to wrap the temple of Defendants' frame

without damaging one's finger, Defendants maintain their frames do not satisfy the "soft springy feel" element. The purpose of the '955 patent, however, is comfort and durability in a pair of eyeglass frames that exceeds that of conventional frames. Interpreting the "soft springy feel" limitation in light of that purpose and comparing Defendants' frames with conventional metal frames, it is abundantly clear that the NiTi SMA components of Defendants' frames have a much softer and springier feel than the conventional frames and thus possess the characteristics covered by this element of Claim 1.

*5) Said portion having greater than 3% elasticity over a temperature range from −20°C. to +40°C.*

The fifth element of Claim 1 requires that the NiTi SMA portion of the frame "have greater than 3% elasticity over a temperature range from −20°C. to +40°C." Plaintiffs contend that this element means that at every temperature within the indicated range, the frame portion will recover at least 3% of its original shape after being subjected to stress and then released. Thus, if a frame portion were stretched 4% beyond its original shape and upon release recovered more than 3% of its original shape, the "3% elasticity" element would be met despite the 1% residual strain. Defendants assert that this particular element requires that the frame portion show complete recovery, *i.e.* a return to origin, after a strain greater than 3%.

■■■ The Court considers first the language of the claim itself. *North American Vaccine,* 7 F.3d at 1575. It is true that *Random House Dictionary,* cited by Defendants, defines "elasticity" as "the capacity of a material to recover its original form upon the removal of a force," a definition that in general was affirmed by Defendants NiTi SMA expert Dr. Schetky, their engineering expert Mr. Bjorge, and indeed to some extent by Plaintiffs' NiTi SMA expert Professor Beshers. Nonetheless interpretation of a claim term by reference to dictionary definitions without first acknowledging its use in the specification or prosecution history is inappropriate. *See Hormone Research,* 904 F.2d at 1563. Indeed, in selecting language

for a patent claim, the patentee is not confined to dictionary definitions of the terms used. "Patent law," as previously observed, "allows the inventor to be his own lexicographer." *Fromson v. Advance Offset Plate, Inc.,* 720 F.2d 1565, 1569 (Fed.Cir.1983). Terms, however, must be construed "in connection with the other parts of the patent instrument and with circumstances surrounding the inception of the patent application." *Id.* At the same time, if a patent applicant wishes to give claimed terms an uncommon meaning, "he must set out his uncommon definition in some manner within the patent disclosure." *Hoganas,* 9 F.3d at 951; *Intellicall,* 952 F.2d at 1385.

█ To begin, it should be noted that Professor Beshers agreed only as to the definition of elasticity in its elementary concept. He specifically clarified that the elementary definition of elasticity put forth by Defendants was not applicable in the context of the NiTi-based SMA eyeglass frames defined in the patent. In that regard, he was careful to define elasticity as recovery of at least 3% of the original shape of the framed portion when subjected to an appropriate load and released. Moreover, language in the specification favorable to Plaintiffs' interpretation appears at the very first sentence in the section entitled "Summary of the Invention" which reads: "It is the purpose of the instant invention to provide eyeglass frames which (1) are highly resistant to permanent deformation, or "kinking," over the full range of ambient temperatures...."

The stated purpose, it may be noted, is not to provide frames that are "totally" resistant to permanent deformation, which is the clear implication of the definition that Defendants contend for, *i.e.* that any material with a strain over 3% must spring back to origin. The purpose of the patent is to provide frames "highly," which is to say "largely," "greatly," or "to a considerable degree" resistant. Plaintiffs' interpretation would thus seem more sensible than Defendants, *i.e.* over the ambient temperature range, Plaintiffs' frame components will more likely than conventional frames resist permanent deformation when subjected to a reasonable range of stresses. The components, in other words, will recover at least 3% of their original shape, possibly more depending on the temperature.

Defendants point out, however, that in disclosing how to achieve "the desired very high elasticity property," the patent equates "optimized elasticity" properties with Figure 2H of the patent which shows full recovery of the frame upon release of the stress. In addition, Defendants cite the following sentence which appears at Column 6, lines 1 through 4, of the patent: "Thus, throughout the temperature region of interest for eyeglass frames, the component acts completely elastically up to strains of 6% or more. This is many times the range achieved with traditional metal frame materials." Defendants argue that this establishes that elasticity must mean complete recovery of the stretched materials to their original size or length at all indicated temperatures.

As used within the patent, however, the term "elasticity" and its variants suggest otherwise. Thus the first example given in the patent "show(s) complete elastic springback at room temperature," which certainly implies that at other temperatures elasticity may be less than complete. *See Read Corp. v. Portec, Inc.,* 970 F.2d 816, 823 (Fed.Cir. 1992). At the same time, the temple described in the first example is said to have "greater than 6% elasticity over a temperature range of −20°C. to +40°C." Presumably "complete elastic springback" and "6% elasticity" have different meanings, otherwise the term "complete" elastic springback could have been used to refer to elasticity over the entire temperature range.

The second example given in the patent describes a temple that exhibits "3.7% elastic springback and imparts 3.8% shape-memory recovery when heated." The third example lies between the first two and is said to yield "5.0% elastic springback and imparts 2.25% shaped memory recovery." These two examples obviously do not exhibit "complete elastic springback," since they have respectively 3.8% and 2.25% shape-memory recovery, residual deformations to be recovered by applying heat. Again, however, the initial recovery in these two examples is described as "elastic." Figure 2G of the patent is in

accord. It shows an 8% elongation springing back to a 3% elongation (*i.e.* 5% elasticity), with the residual 3% returning to origin by means of "heat recovery."

Finally, as noted in *Specialty Composites,* "a review of other claims in the same patent can aid in deciding the scope of a particular claim." 845 F.2d at 986. The fact that Claim 5 of the '955 patent describes a component that combines "a minimum of 3% heat recoverable memory ... and at least 3% elasticity," further indicates that "elasticity" means something other than "full elastic recovery."

Defendants nonetheless suggest that when Plaintiffs were trying to distinguish their claimed frames from prior art in order to persuade the PTO to allow their application, they defined "greater than 3% elasticity" to mean that, at strains greater than 3%, the material would return to zero. They cite in particular Plaintiffs' discussion of the so-called Mercier article.[5] That article, however, reported test results of a shape-memory alloy material that exhibited a substantial permanent deformation when tested at a single temperature (100° C.), which is outside the temperature range required in Claim 1 ($-20°C.$ to $+40°C.$). In addition, the Mercier article does not disclose the level of elasticity, nor indeed any other appropriate features of its material, at any temperature other than 100°C., a fact that the PTO examiner apparently found significant, since he was unwilling to infer that similar properties would obtain at different temperatures, especially those within the range of Claim 1 of the '955 patent. In other words, the residual strain *vel non* of the Mercier material was ultimately irrelevant to the PTO reexamination of the '955 patent. Even so, the Court concludes that Plaintiffs' statements regarding the Mercier material amounted to no more than a suggestion that, even at the presumably optimal temperature at which it was tested, the material exhibited permanent deformation and that a frame component made of the material would become permanently deformed or kinked. "Every state-

ment made by the patentee during prosecution to distinguish a prior art reference does not create a separate estoppel. Arguments must be reviewed in context." *Read Corp.,* 970 F.2d at 824. Defendants' estoppel argument finds little favor in this Court. Reviewed in context, nothing Plaintiffs said in the reexamination process suggests a limitation of Claim 1 or disavowal of any subject matter of Patent '955.

Having construed the 3% elasticity element of the claim consistently with Plaintiffs' view, the Court has no difficulty in concluding that each of Defendant's frame components exhibits at least 3% elasticity over the required temperature range. Professor Beshers, on behalf of Plaintiffs, performed tensile tests on Defendants' frames at $-20°C.$, $0°C.$, room temperature, and $+40°C.$ to determine whether they satisfied this element of Claim 1, and concluded that they did. Defendants, on the other hand, presented no tests or evidence by way of rebuttal.

The Court finds Plaintiffs are likely to succeed at trial in proving that the fifth element of Claim 1 is contravened.

### 3) *Strength of Plaintiffs' Showing of Likelihood of Success on the Merits*

Having convinced the Court that they are likely to prevail at trial with regard to the issues of validity and infringement, Plaintiffs have fulfilled the first requirement for the issuance of a preliminary injunction. What remains is to determine how "strong" Plaintiffs' showing has been, since a strong showing as to this element will raise a presumption of irreparable harm to Plaintiffs should the preliminary injunction not issue.

██ The Court concludes that Plaintiffs have made a strong showing of likelihood of success on the merits, particularly in light of Defendants' lack of evidence. Defendants have pinned their case almost entirely on their own definition of "elasticity," basing it, moreover, on sources largely outside the '955 patent disclosure. Defendants knew of the Beta patents when they commenced their

---

**5.** The "Mercier article" was cited as prior art in the Request for Reexamination for the '955 patent. Its full citation is Mercier, O. & Török, E., *Mechanical Properties of the Cold–Worked Martensitic NiTi Type Alloys,* Journal de Physique, Dec. 1982, at C4–267.

sales activity in mid–1993, yet even as of the time this suit commenced, approximately one year later, they appear to have performed no tests showing non-infringement. Even with additional time to prepare for the evidentiary hearing, Defendants presented no affirmative evidence of non-infringement. While they offered the testimony of Mitsuru Aiba from Kanto, the manufacturer of the wire used in their frames, Defendants called no one from the frame manufacturer and no one from the manufacturer's subcontractors. Aiba testified Kanto had no documents in its possession regarding the manufacture of the actual parts of the frame (a dubious proposition in the Court's opinion) and in any case Defendants produced no such documents or testimony from any source. Yet if anything is clear, it is that the claimed properties result from the manufacturing process; they are not inherent in the alloy itself. Expert testimony and experiments conducted by the patentee, weighed against the absence of tests and lack of hard evidence by the accused infringer, will support a finding of infringement. *See Electro Medical Sys., S.A. v. Cooper Life Sciences, Inc.,* 34 F.3d 1048, 1055 (Fed.Cir.1994). They also enhance Plaintiffs' case to the point that the Court is unhesitatingly able to conclude that Plaintiffs have made a strong showing of likelihood of success on the merits.

#### B) *Irreparable Harm*

■ Having concluded that Plaintiffs have made a "strong showing" of likelihood of success on the merits, the Court presumes they will be irreparably harmed unless the preliminary injunction issues. *See H.H. Robertson,* 820 F.2d at 390. But apart from the presumption, other evidence introduced by Plaintiffs also suggests that such harm would result unless the Court acts.

Irreparable harm has been found where a patentee's market representation and goodwill would not be fully compensable with money damages. *See Hybritech,* 849 F.2d at 1456–57; *Henkel Corp. v. Coral, Inc.,* 754 F.Supp. 1280, 1308 (N.D.Ill.1990), *aff'd without op.,* 945 F.2d 416 (Fed.Cir.1991). In this regard, Plaintiffs' evidence shows they have spent considerable sums to develop a high quality image for their Flexon frames. They have set a policy whereby they distribute only to choice retail outlets, carefully avoiding discount retailers and refusing to sell the Flexon product under private labels. Sales of Defendants' frames to the discount trade, in the Court's judgment, would very likely tend to diminish Plaintiffs' cultivated image as well as undermine its customer base.

Additionally, the market for flexible eyeglass frames is unquestionably ripe and would almost certainly be invaded by numerous other potential infringers if Defendants are not enjoined. Defendant Dahan himself wrote to one of the Japanese manufacturers, "As I explained before, if we win this battle with Beta, this will open the door to all other suppliers at a much lower price." The presence of other potential infringers is a further factor that courts have relied on in finding irreparable harm. *See Hybritech,* 849 F.2d at 1456 (court identifying district court's reasons for concluding irreparable harm); *Yenzer v. Agrotors, Inc.,* 764 F.Supp. 974, 984 (M.D.Pa.1991); *Upjohn Co. v. Medtron Labs., Inc.,* 751 F.Supp. 416, 430 (S.D.N.Y. 1990), *aff'd without op.,* 937 F.2d 622 (Fed. Cir.1991); *Henkel,* 754 F.Supp. at 1308–09.

At the same time, the fact that Plaintiffs may not have sought injunctive relief in the Tura litigation, while noteworthy, is not dispositive. While a patentee may be willing to abide the presence of one competitor while an infringement action pends, it is plausible that the presence of yet another competitor might impel the patentee to have recourse to more drastic, in this case preliminary injunctive, relief.

Finally, while the inability of an alleged infringer to respond in money damages has been cited in some cases in support of a finding of irreparable harm, *see, e.g., Illinois Tool Works, Inc. v. Grip–Pak,* 906 F.2d 679, 682–83 (Fed.Cir.1990), the Court is persuaded that intervenors Kanto and Nissey are able to make good any money judgment that might be entered against the other Defendants herein. Notwithstanding this, for the reasons already stated, the Court is satisfied that Plaintiffs will suffer irreparable harm if a preliminary injunction is not granted.

## C) *Balance of Hardships*

██ The Court has concluded that Plaintiffs would suffer irreparable harm if a preliminary injunction does not issue; it now considers the countervailing harm Defendants would suffer if it does issue. *See H.H. Robertson,* 820 F.2d at 390.

Custom Optical's principal contention is that, since the entry of the Temporary Restraining Order, it has been losing 25% of its total business, amounting to some $8,800 in profits per day. It also claims loss of goodwill built up with customers.[6] The Court is unmoved. Every accused infringer is able to argue loss of sales or profits if it is not allowed to sell the challenged product. Moreover, Defendants have not convinced the Court that they ever enjoyed substantial goodwill with regard to the sale of flexible frames in the first place. From the time Defendant Dahan was contacted by the Japanese enterprises to act as a conduit for the distribution of NiTi-based SMA frames in the United States, all Defendants as well as the market have been aware of the Beta patents and Marchon's exclusive license. The evidence suggests that Defendants Custom Optical and Dahan acted more or less furtively in approaching certain of Plaintiffs' customers, including Lenscrafters and Pearle Vision, to solicit sales of the Technoflex frames. Some potential customers, as noted above, asked for infringement bonds. Under the circumstances, Defendants' claim that they have established and are losing goodwill in the market for flexible frames is less than compelling.

The Court finds that the balance of hardships in this case favors Plaintiffs.

## D) *The Public Interest*

In *Hybritech,* the Federal Circuit stated, "Typically, in a patent infringement case, although there exists a public interest in protecting rights secured by valid patents, the focus of the district court's public interest analysis should be whether there exists some critical public interest that would be injured

by the grant of preliminary relief." 849 F.2d at 1458 (footnotes omitted).

In arguing that the public interest favors neither side, that the public interest in the protection of patent rights is counterbalanced by the right of competition, Defendants in effect concede the point. The Court finds there is no critical public interest that would be injured by the grant of preliminary relief in this matter.

## IV. *BOND*

██ Federal Rule of Civil Procedure 65(c) provides that no preliminary injunction shall issue "except upon the giving of security by the applicant, in such sum as the court deems proper, for the payment of such costs and damages as may be incurred or suffered by any party who is found to have been wrongfully enjoined or restrained." In the Fourth Circuit, damages will not be awarded on an injunction bond unless it can be shown that the plaintiff prosecuted the suit maliciously and without probable cause. *See Greenwood County v. Duke Power Co.,* 107 F.2d 484, 488 (4th Cir.1939), *cert. denied,* 309 U.S. 667, 60 S.Ct. 608, 84 L.Ed. 1014 (1940); *Pargas, Inc. v. Empire Gas Corp.,* 423 F.Supp. 199, 244 (D.Md.), *aff'd* 546 F.2d 25 (4th Cir.1976). Moreover, damages claimed under an injunction bond must arise from the operation of the injunction itself, not from damages occasioned by the suit independently of the injunction. *Lever Bros. Co. v. International Chem. Workers Union,* 554 F.2d 115, 120 (4th Cir.1976). Claims based upon speculation or conjecture, including claims for profits from a business contemplated but not established, will not support an award of damages on the bond. *Duke Power,* 107 F.2d at 488; *Pargas,* 423 F.Supp. at 244.

Based on orders for Superflex and Technoflex frames taken in March, April and May, 1994 for scheduled delivery between July and September, 1994, Custom Optical estimates that it is losing profits at the rate of $8,800 per day. Defendants thus argue for a bond in an amount that would cover "lost" profits at that rate during the time necessary for

---

**6.** Defendants' other arguments pertaining to balance of hardships are nothing more than replays of the argument that Plaintiffs will suffer no irreparable harm if the injunction does not issue, a proposition the Court has already rejected.

them to effect an appeal to the Federal Circuit. By the Court's calculation, the total amount of bond based on that formula would exceed some six million dollars. Plaintiffs, in response, minimize the likelihood that their request for preliminary injunctive relief will ever be shown to have been malicious or without probable cause and, in any case, say that Defendants' claimed damages are either speculative and remote or grossly overstated. The Court agrees with Plaintiffs.

Having considered all relevant factors, the Court will set the preliminary injunction bond in the amount of $500,000.

A separate Order will issue implementing this decision.

### ORDER

Upon consideration of the evidence presented at the hearing on this matter, the post-hearing submissions by the parties and all previous submissions of the parties pertaining to Plaintiffs' Motion for Preliminary Injunction, it is this 14th day of July, 1995

ORDERED that Defendants Custom Optical Frames, Inc., Charles Dahan, Nissey Co., Ltd., Kanto Special Steel Works, Ltd., and all persons in active concert or participation with one or more of the Defendants are hereby enjoined until further order of this Court from promoting, offering for sale, importing, selling, shipping or distributing in the United States eyeglass frames having at least a portion thereof fabricated from nickel-titanium based shape-memory alloy, said portion being in the work-hardened pseudoelastic metallurgical state, said portion having been subjected to work-hardening and having a low effective elastic modulus giving a soft, springy feel, and said portion having greater than 3% elasticity over a temperature range from $-20°C$. to $40°C$.; and it is further

ORDERED that this Preliminary Injunction includes, but is not limited to, eyeglass frames manufactured from "Kantoc Elaster" material, eyeglass frames sold by Defendants under the name "Technoflex," and eyeglass frames sold under the name "Georgio Vincente," model numbers 115–D, 221–F, 320–F and 321–F; and it is further

ORDERED that, pursuant to Fed.R.Civ.P. 65(c), Plaintiffs shall promptly post a bond with the Clerk of Court in the amount of Five Hundred Thousand Dollars ($500,-000.00) for the payment of such costs and damages as may be incurred if Defendants are later found to have been wrongfully enjoined.